**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| SECURITES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | Civil Action No. 22-CV-5703 |
| v. | : : | JURY TRIAL DEMANDED |
| JAMES T. PATTEN, PETER L. COKER, SR., AND PETER L. COKER, JR., | : : : | |
| Defendants. | : : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), 1617 JFK

Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, files this Complaint against the

following three Defendants:

1.  James T. Patten
    219 Lucerne Ln.
    Winston Salem, NC 27104

2.  Peter L. Coker, Sr.
    12804 Morehead
    Chapel Hill, NC 27517

3.  Peter L. Coker, Jr.
    Pacific Place Apartments, Suite 3009
    88 Queensway Central
    Hong Kong (SAR)

The SEC alleges as follows:

## SUMMARY OF THE ACTION

4.      Defendants James T. Patten ("Patten"), Peter L. Coker, Sr. ("Coker Sr."), and Peter L. Coker, Jr. ("Coker Jr.") (collectively, "Defendants") perpetrated two fraudulent manipulative trading schemes.

5.      Defendants took control of the issued and outstanding shares of two companies: Makamer Holdings, Inc. (f/k/a Hometown International, Inc.) ("Hometown International"), an entity that had operations consisting only of a single deli in southern New Jersey, and EZRaider Co. (f/k/a E-Waste Corporation) ("E-Waste Corp."), a shell company that had no substantive operations.  Defendants artificially inflated the price of these companies' stock through manipulative trading that Defendants executed through affiliated and nominee accounts they controlled, often using the same IP addresses to execute the trades.  In so doing, Defendants artificially raised the price and trading volume of the entities' common stock, creating the false appearance of active trading and a rising price for the security.

6.      Via their scheme, Defendants artificially inflated the price of common stock of Hometown International to more than $13.00 per share, which produced a market capitalization of approximately $100 million for a single-store deli with less than $40,000 in annual revenue.

7.       At around the same time, Defendants artificially inflated the price of E-Waste Corp. common stock from $0.10 to $10.00 per share, which resulted in a market capitalization of approximately $120 million for a shell company with no revenue.

8.      Defendants have profited from their scheme via selling and holding the stock of Hometown International and E-Waste Corp. at artificially inflated values and by causing the companies to transfer funds to them, directly or through purported "consulting" agreements.

9.      In addition, Defendants have injured innocent investors who purchased the stock of Hometown International and E-Waste Corp. at artificially inflated prices.

10.     By engaging in the conduct described in this Complaint, Patten, Coker Sr., and Coker Jr. violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].  In addition, Patten is liable for violating Section 9(a)(1) of the Exchange Act  [15 U.S.C. § 78i(a)(1)], and Coker Sr. and Coker Jr. are liable for aiding and abetting Patten's violations of Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78t(e)].

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (d)] and Sections 20(e) and 21(d) of the Exchange Act [15 U.S.C. §§ 78t(e), 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, and civil money penalties.  The Commission also seeks a judgment prohibiting Defendants from participating in an offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].  The Commission also seeks any other and further relief the Court may deem just and appropriate.

12.     The Court has jurisdiction pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  Defendants, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facility of national security exchanges, in

connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

13.     Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, and courses of business constituting the alleged violations occurred within the District of New Jersey.

## DEFENDANTS

14.     **James T. Patten (previously defined as "Patten")**, age 63, resides in Winston Salem, North Carolina.  Patten is employed by Tryon Capital LLC, which is controlled by Coker Sr. and another individual ("Individual 1").  Patten also controls Benchmark Capital LLC and is Vice President of Global Equity Limited.  In 2006, FINRA barred Patten from associating with any member firm.  Prior to that time, Patten was associated with several broker-dealers and was the subject of repeated disciplinary actions by FINRA.

15.     **Peter L. Coker Sr. (previously defined as "Coker Sr.")**, age 80, is a resident of Chapel Hill, North Carolina.  Along with Individual 1, Coker Sr. controls Tryon Capital LLC and Europa Capital Investments LLC.  From 1999 to 2003, Coker Sr. was a registered broker.

16.     **Peter L. Coker Jr. (previously defined as "Coker Jr.")**, age 53, is a resident of Hong Kong.  Coker Jr. is the son of Coker Sr. and is the former Chief Executive Officer and Chairman of the Board of Hometown International.  Coker Jr. served as Chairman of the Board of Hometown International from February 2020 through April 2022 and as Chief Executive Officer of the company from May 2021 through April 2022.  Coker Jr. has served on the board of other private and public companies located in Hong Kong and New Zealand.  Coker Jr. controls a number of Hong Kong and U.S.-based nominee entities, which defendants used to

perpetrate the schemes alleged in this case, including Global Equity Limited, IPC-Trading Company, RTO Limited, and VCH Limited.  Coker Jr. was previously registered as a broker.

## RELATED ENTITIES AND INDIVIDUAL

17.     **Makamer Holdings, Inc. (f/k/a Hometown International, Inc.) (previously defined as "Hometown International")** is incorporated in Nevada with a current principal place of business in Los Angeles, California.  The company's shares are quoted on OTC Link, whose parent company is OTC Markets Group, Inc., under the trading symbol HWIN.  Hometown International voluntarily files quarterly and annual reports with the SEC.  In April 2022, the company completed its acquisition of a private Delaware corporation and changed its name with the State of Nevada from Hometown International, Inc. to Makamer Holdings, Inc.  At the same time, Coker Jr. was replaced as Chief Executive Officer by Makamer Holdings' President.  Makamer Holdings purports to develop and market biodegradable resins.  The single deli that comprised Hometown International's operations was located in New Jersey.  In addition, from the time Hometown International was formed until May 2021, the President and Vice President of Hometown International were individuals who resided in New Jersey.  Patten communicated with these individuals regarding Hometown International while they were in New Jersey.  In addition, Patten communicated with at least one nominee account holder residing in New Jersey whose brokerage account Patten used to engage in manipulative trading in connection with the schemes alleged herein.

18.     **EZRaider Co. (f/k/a E-Waste Corporation) (previously defined as "E-Waste Corp.")** is incorporated in Nevada with a current principal place of business in Kent, Washington.  The company's shares are quoted on OTC Link under the trading symbol EZRG.  E-Waste Corp. voluntarily files quarterly and annual reports with the SEC.  In September 2021,

E-Waste Corp. merged with EZRaider Global, Inc., a private Nevada corporation that purports to import and distribute electric-powered vehicles, and changed its name to EZRaider Co.  As of the date of the merger, EZRaider's founder was appointed Chief Executive Officer of the company.  In October 2021, the company changed its trading symbol from EWST to EZRG.

19.     **Individual 1** is a resident of Greensboro, North Carolina.  Along with Coker Sr., Individual 1 controls the entities Tryon Capital LLC and Europa Capital Investments LLC.

20.     **Tyron Capital LLC (f/k/a Tryon Capital Ventures, LLC)** ("**Tryon Capital**") is incorporated in North Carolina with a principal place of business in Carrboro, North Carolina.  It is owned and controlled by Coker Sr. and Individual 1.  Patten is an employee of Tryon Capital.  Tryon Capital was engaged as an alleged consultant to both Hometown International and E-Waste Corp.

21.     **Europa Capital Investments LLC ("Europa Capital")** is incorporated in North Carolina with a principal place of business in Chapel Hill, North Carolina.  It is owned and controlled by Coker Sr. and Individual 1.

22.     **Global Equity Limited ("Global Equity")** is incorporated in North Carolina with a principal place of business in Chapel Hill, North Carolina.  It is owned and controlled by Coker Jr., and Patten serves as Vice President of the entity.

23.     **IPC-Trading Company ("IPC-Trading")** is an entity located in Macau, China.  It is a nominee entity controlled by Coker Jr.

24.     **RTO Limited ("RTO")** is an entity located in Macau, China.  It is a nominee entity controlled by Coker Jr.

25.    **VCH Limited ("VCH")** is a company formed under the laws of Macau, China.  It is a nominee entity controlled by Coker Jr.  VCH was engaged as an alleged consultant to Hometown International.

26.    **Benchmark Capital LLC ("Benchmark Capital")** is incorporated in New Jersey with a principal place of business in Winston Salem, North Carolina.  It is owned and controlled by Patten.  Benchmark Capital was engaged as an alleged consultant to E-Waste Corp.

## TERMS USED IN THIS COMPLAINT

27.    Common stock is a form of equity ownership in a corporation.

28.    A "matched trade" is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

29.    A "wash trade" is an order to buy or sell securities resulting in no change of beneficial ownership for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating false or misleading appearance with respect to the market for any such security.

30.    "OTC Link LLC" ("OTC Link") is owned by OTC Markets Group Inc.  OTC Link is an electronic inter-dealer quotation system that displays quotes in three tiers from broker-dealers for over-the-counter ("OTC") securities.

31.    The "OTC Pink Open Market" ("OTC Pink Market") is the lowest tier marketplace for the trading of OTC securities.  The OTC Pink Market has no financial or

disclosure requirements.  The issuers quoted on the OTC Pink Market tend to be small companies with volatile, thinly traded stocks.

32.     The "OTCQB" is the middle tier marketplace for the trading of OTC securities and consists mainly of early-stage and developing U.S. and international companies.  Issuers quoted on the OTCQB must be current in their reporting, undergo an annual management verification, have a minimum bid of $0.01, not be in bankruptcy, have at least 50 beneficial shareholders each owning at least 100 shares, and have an amount of publicly tradeable shares of stock in excess of 10% of the total shares of stock outstanding.

33.      "Form S-1" is the registration statement under the Securities Act of 1933 that domestic issuers file with the Securities and Exchange Commission in order to publicly offer new securities.

34.     "IP address" means internet protocol address, which is a unique numerical label that identifies an electronic device on the internet or local computer network.

## FACTS

**I.     DEFENDANTS PERPETRATED A FRAUDULENT SCHEME REGARDING HOMETOWN INTERNATIONAL SECURITIES**

### A.  Defendants Used Hometown International as a Vehicle to Perpetrate Their Fraud

35.     From 2014 through the present, Defendants have engaged in a long-running fraudulent scheme to take control of the outstanding shares of Hometown International; artificially inflate the value of those shares through matched and wash trades in which Defendants, their nominees, and/or affiliates controlled both sides of the trade; and eventually profit from their control of the company and inflated value of the shares of Hometown International stock.

36.     In approximately 2014, Patten assisted his childhood friend ("Individual 2") and Individual 2's girlfriend ("Individual 3"), both New Jersey residents, in opening a deli in Paulsboro, New Jersey.  The entity was incorporated as Hometown International in May 2014, and the single-store deli opened more than a year later, on October 14, 2015, as a wholly-owned subsidiary of Hometown International, operating under the name Your Hometown Deli.

37.     After Hometown International was incorporated, but before the deli opened for business, between July 2014 and June 2015, Patten and Coker Sr. orchestrated the sale of Hometown International shares of common stock to a number of individuals related to or associated with Patten, Coker Sr. and Individual 1.

38.     At the time Hometown International was formed and throughout the conduct described in this Complaint, Individuals 2 and 3 were employed at a New Jersey high school. Although Individuals 2 and 3 held the titles of President and Vice President of Hometown International, they were responsible only for running the day-to-day business of the deli.

39.     At the direction of Patten and Coker Sr., Hometown International took the necessary steps to become a public company.  Individuals 2 and 3 were only minimally involved in the plan to make Hometown International a publicly traded company.

40.     On October 20, 2019, Hometown International stock began trading on the OTC Pink Market.

### B. Defendants Take Control of Hometown International's Outstanding Stock and Distribute Shares to Various Nominees and Affiliates

41.     Approximately two months after Hometown International's shares became publicly traded and were listed on the OTC Pink Market, Defendants began to take control of the outstanding shares of Hometown International.  On December 31, 2019, Patten orchestrated the sale of a total of 2 million shares by Individuals 2 and 3, approximately 38% of the outstanding

stock of Hometown International, to Coker Jr. for $3,000. Individuals 2 and 3 had each acquired 2.5 million shares of Hometown International in May 2014, pursuant to a Membership Interest Purchase Agreement they entered into with the issuer.

42.    Approximately one month later, on February 1, 2020, Patten orchestrated the granting by Individual 3 to Coker Jr. of an option to purchase Individual 3's remaining 1.5 million shares, approximately 28% of the outstanding stock of Hometown International.

43.    Shortly thereafter, in February 2020, Coker Jr. was appointed Chairman of the Board of Hometown International.

44.    The following month, on March 19, 2020, Coker Jr. exercised the option he had acquired from Individual 3 and purchased 1.5 million shares of Hometown International stock. The purchases by Coker Jr. reflected a steep discount to the market price of Hometown International stock at the time.

45.    The next day, in an email to his father, Coker Jr. explained that he planned to transfer the shares out of his own name in order to disguise his control over a significant percentage of the outstanding shares of Hometown International.

46.    Over the course of the following month, Defendants orchestrated the transfer of all 3.5 million shares of Hometown International that Coker Jr. had acquired from Individuals 2 and 3 to four nominee entities located in Macau, China, which were in fact controlled by Coker Jr.

47.    First, on April 6, 2020, Coker Jr. "sold" 2 million shares of Hometown International stock at a price of $.0015 per share to Global Equity.

48.    Nine days later, on April 15, 2020, Coker Jr. "sold" the remaining 1.5 million shares of Hometown International stock at the same price of $.0015 per share to the entities

VCH, IPC-Trading, and RTO, all of which were located in Macau, China and controlled by Coker Jr.

49.     The price at which Coker Jr. "sold" these shares was significantly lower than the market price at the time, which was approximately $4.00 per share.

50.     In addition to the transfer of these 3.5 million shares to the four entities controlled by Coker Jr., around the same time, Defendants caused the transfer of Hometown International shares of stock to other affiliates.  For example, on March 18, 2020, $100,000 of debt owed by Hometown International to Europa Capital, an entity controlled by Coker Sr. and Individual 1, was converted into 100,000 shares of common stock.

51.     About two months later, on May 20, 2020, Europa Capital used stock obtained through the converted debt to gift blocks of between 100 and 500 shares to 21 individuals, almost all of whom have a known relationship with Patten, Coker Sr., and/or Individual 1.

### C. The Transfer of Shares to Nominees and Associates Enabled Hometown International to Uplist to the OTCQB in Furtherance of the Scheme

52.     Defendants understood that to "uplist" from the OTC Pink Market to the OTCQB, among other things, Hometown International needed to have a minimum of 50 shareholders and more than 10% of its outstanding stock available to be traded publicly.

53.     The gifting of shares to associates and nominee accounts controlled by the Defendants, orchestrated by Patten and Coker Sr., enabled Hometown International to meet the 50 shareholder requirement.

54.     Shortly after the transfer of shares to affiliates of Patten and Coker Sr. and to Coker Jr.'s nominee entities, on June 8, 2020, Defendants orchestrated the filing of a Form S-1 to register 2.7 million shares of stock, including shares owned by two of Coker Jr.'s nominee entities, Coker Sr., Europa Capital, and at least seventeen individuals related to or associated

with Patten, Coker Sr., and/or Coker Jr., so that the shares could be sold on the open market. The registration also enabled Defendants to satisfy the requirement that more than 10% of the company's stock be available for public trading.

55.     The Form S-1 that was filed with the SEC falsely stated that "[n]one of the Selling Shareholders nor any of their respective affiliates have held a position or office, or had any other material relationship, with us or any of our predecessors or affiliates."

56.     Defendants caused this statement to be published in the Form S-1 despite their knowledge that the selling shareholders had direct relationships as nominees of Patten, Coker Sr., Coker Jr., and/or their entities.

57.     On October 15, 2020, the registration took effect and the registered shares of Hometown International could be sold publicly.

58.     The change in listing from the OTC Pink Market to the OTCQB provided more visibility for Hometown International's securities, fewer obstacles to trading its shares, and enabled the shareholders whose shares were registered in the Form S-1 to sell their shares at a price higher than $6.50, as the Form S-1 Registration Statement capped the sale price at $6.50 per share until the shares were quoted on certain markets, including the OTCQB.

59.     The uplisting also provided a veneer of apparent legitimacy to Hometown International in its quest to attract a corporate partner and enter into a reverse merger.

**D.  Defendants Profited From Their Fraud**

**1.  Defendants Transferred Money to Themselves From Hometown International Via Direct Payments and Purported Consulting Agreements**

60.     At the same time that Patten, Coker Sr., and Coker Jr. endeavored to take control of Hometown International's issued and outstanding shares of stock through associates and nominee individuals and entities, they engaged in several efforts to profit from their control over

the company which, as Coker Jr. described in an email to an associate, had been "curated . . . from day 1."

61.     Although Individuals 2 and 3 were signatories on Hometown International's checking account, Patten had access to the account online using usernames and passwords that Individuals 2 and 3 had provided to him.  Patten was also able to access the account via hard copy checks, which he could "sign" using a stamp in the name of Individual 3 that Patten possessed.

62.     On April 14, 2020, Hometown International and three investors located in Hong Kong consummated a private placement, orchestrated by Defendants, in which Hometown International transferred 2.5 million shares of stock for $2.5 million.

63.     The proceeds of the sale were transferred to the Hometown International checking account.

64.     In the weeks following the infusion of $2.5 million into the Hometown International checking account, Patten transferred more than $534,000 out of the account to Coker Sr. and Coker Jr.  Specifically, more than $291,000 was transferred to Coker Sr.'s personal account, more than $47,000 to Europa Capital, more than $95,000 to Tryon Capital, and $100,000 to VCH.

65.     In May 2020, Defendants caused Hometown International to enter into alleged consulting agreements with both Tryon Capital, controlled by Coker Sr. and Individual 1, and VCH, one of Coker Jr.'s nominee entities.

66.     Pursuant to these agreements, Hometown International transferred $15,000 per month to Coker Sr. through Tryon Capital, and $25,000 per month to Coker Jr. through VCH.

67.    Patten arranged the consulting agreements.  In addition, Patten signed Individual 2's name on the Form 8-K announcing the agreements.

68.    During the period of May 2020 to February 2021, Hometown International transferred $150,000 to Tryon Capital and $600,000 to VCH pursuant to these agreements.

69.    However, on information and belief, these transfers allowed Defendants to reap ill-gotten gains from the scheme, and any "services" in connection with the purported consulting agreements were unnecessary, not performed, or were in furtherance of the scheme.  At the time, the only asset of Hometown International continued to be the lone deli, which had annual revenue of less than $40,000.

### 2.    Defendants Profited From Their Manipulation of the Price of Hometown International Stock

70.    Defendants orchestrated the artificial inflation of Hometown International's stock price through manipulative trading done at their direction or aided by them, engaged in by nominee accounts and in coordination with associates.  In October 2019, Hometown International's stock price was approximately $1.00 per share.  Through their fraud, by April 2021, Defendants artificially inflated the value of Hometown International's stock to nearly $14.00 per share, creating a market capitalization of over $100 million for a company with one deli and less than $40,000 in annual revenue.

71.    Patten took control of the brokerage accounts of friends and relatives of the Defendants, including, among others, accounts in the names of Coker Sr., Coker Sr.'s wife, Coker Sr.'s daughter, and Coker Sr.'s grandson.

72.    Patten engaged in matched and wash trades using limit orders placed in nominee accounts and accounts controlled by associates of the Defendants in order to artificially inflate the price of Hometown International stock.

14

73.    These trades involved no change in the beneficial ownership of the Hometown International stock and/or were placed at substantially similar times, for substantially similar amounts of securities, with Defendants' nominee accounts or affiliates on both sides of the trade. Many of the trades placed through the various nominee accounts were entered using IP addresses associated with Patten.

74.    For example, on November 19, 2020 at 9:50 a.m., a sale order was placed in an account in the name of "A.B.," an associate of Patten.  The order was placed from an IP address associated with Patten.  The following week, a buy order was placed in the account of "M.M.," also an associate of Patten, from the same IP address associated with Patten.  The wash trade was immediately executed, resulting in an exchange of 200 shares at a price of $10.45 per share between one Patten-controlled account and another Patten-controlled account.

75.    On February 9, 2021, the account in the name of "A.B" placed an order to buy Hometown International shares at a price of $13.80 per share from an IP address associated with Patten.  The following day, an account in the name of "K.P.," Patten's sister-in-law, placed an order to sell Hometown International shares at a price of $13.80 per share from the same IP address.  The wash trade was immediately executed, resulting in a sale of 100 shares at a price of $13.80 per share between the two accounts controlled by Patten.

76.    On March 1, 2021 at 12:00 p.m., the "A.B." brokerage account placed an order to buy Hometown International shares at a price of $13.85 from an IP address associated with Patten.  One minute later, an account in the name of "N.P.," the mother of Patten's girlfriend, placed an order to sell at a price of $13.85 from the same IP address, resulting in a transfer of 100 shares between the Patten-controlled accounts.

77.     On March 8, 2021, a wash trade of 200 shares of Hometown International was executed at a price of $13.80.  At 11:46 a.m., the account in the name of "A.B." placed a buy order from an IP address associated with Patten.  One minute later, a sale order was placed in an account in the name of Europa Capital from the same IP address.

78.     Coker Jr. arranged for an associate in China, "Individual 4," to set up a brokerage account that was also used to engage in matched trades with the Patten and Coker Sr.-controlled accounts.

79.     In a December 15, 2020 email from Coker Jr. to Coker Sr. and Patten, Coker Jr. wrote that his associate, "[Individual 4] my hotel guy[,] should have his account set up to trade HWIN by Thursday latest.  I will put you guys in touch with [Individual 4] to get his orders sorted on a daily basis.  . . . Let's try to keep the exposure only at what we need I don't want to burn him out so orders of 100-200-300 daily is do-able."

80.     Almost immediately following this email, Individual 4's account was used to engage in a matched trade with the "A.B" brokerage account, controlled by Patten.

81.     On December 17, 2020 at 12:37 p.m., an order to sell 200 shares of Hometown International was placed in the account in the name of "A.B."  The order was placed from an IP address associated with Patten.  The next day, at 1:13 p.m., an order to buy 200 shares was placed in the account of Individual 4 from a Hong Kong IP address.  The matched trade was immediately executed with 200 shares of Hometown International exchanged between the two accounts at a price of $11.99 per share.

82.     On January 25, 2021, an order to buy 200 shares of Hometown International at a price of $13.90 per share was placed from the account of Individual 4 from a Hong Kong IP address.  Two days later, the "K.P" brokerage account, in the name of Patten's sister-in-law,

placed an order to sell 200 shares at a price of $13.90 per share from an IP address associated with Patten.  The matched trade was executed at 9:49 a.m. on January 27, 2021.

83.     All of these orders were placed at the direction of, or in coordination with, the Defendants.  To ensure that the accounts associated with Defendants comprised the majority of the trading volume of Hometown International stock, and to confirm that each account was engaging in manipulative trading in support of the scheme, Patten received weekly reports from the Depository Trust Company which outlined the week's trading volume at each brokerage account trading in Hometown International stock.

84.     Patten discussed these reports with Coker Sr. on a weekly basis beginning in early 2021.  In an email to Coker Sr. dated February 13, 2021, Patten wrote that, "everyone [is] playing nice.  All seems to check out."

85.     Defendants, their nominees, and affiliates continue to hold securities whose value has been artificially inflated by Defendants' fraud.

86.     However, certain individual investors not associated with Defendants also purchased shares of Hometown International at the artificially inflated prices caused by Defendants' fraud and, thus, have been injured.

**E.     Defendants' Fraudulent Conduct Remains Ongoing**

87.     Defendants have continued with their fraudulent scheme.

88.     On April 15, 2021, negative news stories began to be published regarding Hometown International's potentially inflated stock price, questioning why a company such as Hometown International, a single-store deli, had a market capitalization in excess of $100 million.

89.     Despite this negative press, Defendants continued to endeavor to find a company to engage in a reverse merger with Hometown International so that they could change the name,

ticker symbol, and business operations of the issuer, in order to more easily dump their shares at an artificially inflated price and further profit from their scheme.

90.     In a January 13, 2021 email between the Defendants, Coker Jr. indicated that the Defendants' "strategy" was that the "announcement of [a reverse merger] deal" would lead to a "massive" increase in the trading volume of the issuers, which would allow them to more easily dump their shares into the market.

91.     On May 12, 2021, after Individuals 2 and 3 raised significant concerns with Patten regarding the negative news, Individuals 2 and 3 were removed as officers of Hometown International, and Coker Jr. became Chief Executive Officer of the company.

92.     Approximately ten months later, in a Form 8-K filed on March 31, 2022 and signed by Coker Jr., it was announced that Hometown International had entered into a merger agreement with a private Delaware corporation and that the company had changed its name with the State of Nevada from Hometown International, Inc. to Makamer Holdings, Inc.

93.     On April 1, 2022, the reverse merger was completed, with Hometown International acquiring Makamer Holdings, but operating under the name Makamer Holdings. That same day, Coker Jr. was replaced as Chief Executive Officer by Makamer Holdings' President.  In the reverse merger, the stockholders of Makamer Holdings exchanged shares of Makamer Holdings common stock for shares of Hometown International, and thus the Defendants retained the shares of Hometown International stock that they had acquired in connection with their fraud.  In approximately August 2022, FINRA issued a deficiency letter to Hometown International, effectively rejecting the issuer's request to change its name and ticker symbol, and thus the stock still trades under the Hometown International ticker symbol.

## II.   DEFENDANTS PERPETRATED EFFECTIVELY THE SAME FRAUDULENT SCHEME WITH RESPECT TO E-WASTE CORP. SECURITIES

94.    E-Waste Corp. was incorporated in January 2012 to develop an e-waste recycling business.  However, the company was not able to raise sufficient capital to execute its business plan.  Instead, it sought to engage in a reverse merger with a private entity.

95.    In August 2012, FINRA processed a Form 211 application for the quotation of E-Waste Corp.'s common shares on the OTC Link.

96.    E-Waste Corp. stock began trading on the OTC Link in July 2020, when it began trading on the OTC Pink Market.

97.    In approximately early 2020, prior to its shares being traded on the open market, Patten became involved with E-Waste Corp.  Later that year, in September 2020, "Individual 5," a long-time friend of Patten, was appointed Chief Executive Officer of E-Waste Corp.

98.    Although Individual 5 held the title of Chief Executive Officer, Patten controlled E-Waste Corp., effectively making decisions on behalf of the company, which was a shell company.

### A.  Defendants Controlled the Outstanding Shares of E-Waste Corp. Stock by Transferring Shares to Themselves, Affiliates, and Nominees

99.    After the appointment of Individual 5 as Chief Executive Officer, Defendants orchestrated the transfer of millions of E-Waste Corp. shares into their own names and the names of affiliates and nominee entities.

100.    For example, on September 25, 2020, E-Waste Corp.'s former controlling shareholder sold 6 million shares of E-Waste Corp. stock to Global Equity, an entity controlled by Coker Jr., for a purchase price of $30,000, reflecting a discount to the market price at the time.

101.    That same day, Coker Jr. and Benchmark Capital, an entity controlled by Patten, acquired 475,000 and 250,000 shares, respectively, in a private transaction.  A few weeks later, on October 14, 2020, E-Waste Corp. sold 500,000 shares to both Coker Jr. and Europa Capital, an entity controlled by Coker Sr. and Individual 1.

102.    As with Hometown International, Defendants took control of the outstanding stock of E-Waste Corp., transferred assets from the company to themselves, and artificially inflated the price of the stock through manipulative trading.

**B.      As With Hometown International, Defendants Sought to Profit from E-Waste Corp. Via "Consulting Agreements," a Private Placement, and the Artificial Inflation of the Price of E-Waste Corp. Stock Through Manipulative Trading Practices**

103.    As Patten, Coker Sr., and Coker Jr. took control of the majority of E-Waste Corp.'s issued and outstanding stock through nominee entities, they employed tactics, virtually identical to the Hometown International scheme, to profit from their control over the shell company.

**1.   Defendants Transferred Funds from E-Waste Corp. to Accounts They Controlled Via Purported Consulting Agreements**

104.    In October 2020, E-Waste Corp. retained Tryon Capital, controlled by Coker Sr. and Individual 1, as a consultant, with compensation of $2,500 per month.  In April 2021, the company retained Benchmark Capital, controlled by Patten, as a consultant, with compensation of $5,000 per month.

105.    In E-Waste Corp.'s public filings regarding the Benchmark Capital consulting agreement, E-Waste Corp. identified Benchmark Capital only as a "third party," and failed to disclose the relationship between Patten and E-Waste Corp.

106.    During the period of engagement, E-Waste Corp. transferred $17,500 to Coker Sr. and at least $5,000 to Patten, pursuant to these purported consulting agreements.

107.    As with the Hometown International scheme, on information and belief, these transfers allowed Defendants to reap ill-gotten gains from the scheme, and any "services" in connection with the purported consulting agreements were unnecessary, not performed, or were in furtherance of the scheme.  At the time, E-Waste Corp. was a shell company.

**2.   Defendants Orchestrated a Private Placement Sale to the Same Three Overseas Investors Involved in the Private Placement of Hometown International Stock**

108.    Identical to the Hometown International fraud, Defendants arranged a private placement of 2.5 million shares of E-Waste Corp. stock for $2.5 million to the same three entities who had invested in Hometown International via private placement.  The subscription agreements were entered into on April 12, 2021, and the funds were transferred to the E-Waste Corp. checking account, to which Patten had access.

109.    In the weeks following the transfer of $2.5 million into the E-Waste Corp. checking account pursuant to the private placement, Patten transferred more than $266,000 to Coker Sr.'s personal account.  In addition, some of the money was used to fund the consulting agreement entered into between the company and Patten's entity, Benchmark Capital.

**3.   Defendants Manipulated the Price of E-Waste Corp. Stock Through Manipulative Trading Practices**

110.    Patten orchestrated the artificial inflation of E-Waste Corp.'s stock price through manipulative trading engaged in by nominee accounts with shares purchased on the open market. Patten controlled the brokerage accounts of numerous individuals, friends and relatives of the Defendants, including accounts in the names of Coker Sr., Coker Sr.'s daughter, and Coker Sr.'s grandchildren.  Patten used the accounts to engage in wash trades using limit orders, in order to

artificially inflate the price of E-Waste Corp. stock.

111.    These trades involved no change in the beneficial ownership of the E-Waste Corp. stock, with Defendants' nominees on both sides of the trade.  The trades placed in various nominee accounts by Patten were entered from an IP address associated with Patten.

112.    Between July 2020 and April 2021, the manipulative trading engaged in by Patten and aided by Coker Sr. and Coker Jr. resulted in an increase of E-Waste Corp.'s stock price from $0.10 per share to $10.00 per share.

113.    For example, on November 19, 2020 at 11:23 a.m., Patten executed a wash trade using an account in the name of Coker Sr.'s grandson.  At 11:21 a.m., the account purchased 100 shares of E-Waste Corp. stock at a price of $2.66 per share from an IP address associated with Patten.  Two minutes later, at 11:23 a.m., a sell order was placed in the account in the name of "A.B.," an associate of Patten, from the same IP address.

114.    On December 30, 2020 at 10:54 a.m., Patten executed a wash trade using an account in the name of Coker Sr.'s granddaughter.  The account purchased 100 shares of E-Waste Corp. stock at a price of $4.75 per share from an IP address associated with Patten.  The day before, at 1:09 p.m., a sell order was placed in the account in the name of "M.M.," an associate of Patten, from the same IP address.

115.    On January 13, 2021 at 11:11 a.m., Patten executed a wash trade using an account in the name of Coker Sr.'s daughter.  The account purchased 100 shares of E-Waste Corp. at a price of $5.95 per share.  The day before, at 2:55 p.m., the account in the name of "A.B." placed a sell order from an IP address associated with Patten.  Less than a day later, the account in the name of Coker Sr.'s daughter placed the buy order from the same IP address.

116.    On April 9, 2021 at 1:37 p.m., Patten executed a wash trade using an account in the name of Coker Sr.'s grandson.  The account purchased 100 shares of E-Waste Corp stock at a price of $10.00 per share on April 9, 2021 at 1:27 p.m. from an IP address associated with Patten.  Ten minutes later, at 1:37 p.m., a sell order was placed in the account in the name of "A.B." from the same IP address.

117.    All of these orders were placed at the direction of, or in coordination with, the Defendants.  Associates and/or relatives of the Defendants comprised the majority of the volume of E-Waste Corp. trades by individual investors between July 2020, when the stock began trading at $0.02 per share, and April 2021, when the price of the stock spiked to more than $10.00 per share.

118.    At a price of $10.00 per share, the market capitalization of E-Waste Corp. was $120 million—despite the fact that E-Waste Corp. was a shell company with no revenue.

119.    Certain individual investors not associated with the Defendants also purchased shares of E-Waste Corp. at the inflated prices.

### C.    Defendants' Fraud Continues

120.    The April 2021 negative news regarding Hometown International also included discussion of the suspiciously high stock price of E-Waste Corp. and the shell company's relationship to Hometown International, including loans provided by Hometown International and Coker Sr. to E-Waste Corp., and the two companies' common shareholders and consultants.

121.    Despite this negative press, Defendants identified a private company to engage in a reverse merger with E-Waste Corp.  In September 2021, E-Waste Corp. merged with EZRaider Global, Inc. ("EZRaider"), a Nevada corporation that purports to import and distribute electric-powered vehicles, and changed its name to EZRaider Co.

122.     In the reverse merger, E-Waste Corp. issued shares of common stock to the shareholders of EZRaider in exchange for all issued and outstanding shares of EZRaider.

123.     The Defendants retained the shares of stock in the issuer that they had acquired in connection with the fraud.  The strategy of the proposed defendants was that the announcement of the reverse merger, and corresponding change in business of the issuer (which was, until September 2021, a shell company), would lead to an increase in trading volume so that they would be able to dump their stock, which, at the time of the merger, was still trading at more than $9.00 per share.

124.     As of the date of the merger, EZRaider's founder was appointed Chief Executive Officer of the company.  A registration statement has not been filed by EZRaider, and thus the majority of the shares in E-Waste Corp. currently held by the Defendants and their nominees remain restricted from public sale.

### FIRST CLAIM FOR RELIEF
### (Violation of Sections 17(a)(1) and (3) of the Securities Act)
### (Against All Defendants)

125.     The Commission re-alleges and incorporates by reference paragraphs 1 through 124 as though fully set forth herein.

126.     Defendants Patten, Coker Sr., and Coker Jr., directly or indirectly, singly or in concert, in the offer and sale of any securities, by the use of the means or instruments of transportation and communication in interstate commerce, or by use of the mails:  (1) have employed, are employing, or are about to employ devices, schemes, or artifices to defraud; and/or (3) have engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

127.    By reason of the foregoing, Patten, Coker Sr., and Coker Jr., directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder)**
**(Against All Defendants)**

128.    The Commission re-alleges and incorporates by reference paragraphs 1 through 124 as though fully set forth herein.

129.    Defendants Patten, Coker Sr., and Coker Jr., in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:  (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; and/or (c) have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon other persons.

130.    By reason of the foregoing, Patten, Coker Sr., and Coker Jr., directly or indirectly, singly or in concert, have violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R.§ 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF
**<u>Violation of Section 9(a)(1) of the Exchange Act</u>**
**(Against Patten)**

131.    The Commission re-alleges and incorporates by reference paragraphs 1 through 124 as though fully set forth herein.

132.    During the relevant period, shares of Hometown International and E-Waste Corp. were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

133.    During the relevant time period, Patten knowingly or recklessly, directly or indirectly, singly or in concert, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance with respect to the market for any such security:  (a) has effected transactions in such securities which involved no change in the beneficial ownership thereof; (b) has entered an order or orders for the purchase of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; and/or (c) has entered, is entering, or is about to enter an order or orders for the sale of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such securities had been or would be entered by or for themselves or different parties.

134.    Defendant Patten knowingly or recklessly engaged in manipulative trading practices in Hometown International stock with the intent of manipulating the market for Hometown International stock.

135.    Defendant Patten knowingly or recklessly engaged in manipulative trading practices in E-Waste Corp. stock with the intent of manipulating the market for E-Waste Corp. stock.

136.    By reason of the conduct described above, Defendant Patten violated, and will continue to violate, unless enjoined, Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Patten's Violation of Section 9(a)(1) of the Exchange Act**
**(Against Coker Sr. and Coker Jr.)**

137.    The Commission re-alleges and incorporates by reference paragraphs 1 through 124 and 131 through 136 as though fully set forth herein.

138.    By reason of the foregoing, Defendant Patten violated Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)], by knowingly or recklessly engaging in manipulative trading practices in the securities of Hometown International and/or E-Waste Corp.

139.    Defendants Coker Sr. and Coker Jr. knowingly or recklessly provided substantial assistance to Defendant Patten in connection with Patten's violations of Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

140.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Coker Sr. and Coker Jr. are liable for aiding and abetting Defendant Patten's violations of Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)] and unless enjoined will aid and abet such violations in the future.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Patten, Coker Sr., and Coker Jr. violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Patten, Coker Sr., and Coker Jr. and their agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from, directly or indirectly, engaging in conduct in violation of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)] and Sections 9(a)(1) and 10(b) and of the Exchange Act [15 U.S.C. §§ 78i(a)(1) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

**III.**

Ordering Patten, Coker Sr., and Coker Jr. to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

**IV.**

Ordering Patten, Coker Sr., and Coker Jr. to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**V.**

Prohibiting Defendants from participating in any offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C.§ 78u(d)(6)]; and

**VI.**

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried before a jury.

Respectfully submitted,


By: _____

John V. Donnelly III
Gregory R. Bockin
Assunta Vivolo
Cecilia Connor

Attorneys for Plaintiff:
U.S. SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
215-597-3100 (phone)
215-597-2740 (fax)
DonnellyJ@sec.gov


Date:   September 26, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| | : | Civil Action No. 22-CV-5703 |
| **Plaintiff**, | : | |
| | : | JURY TRIAL DEMANDED |
| **v.** | : | |
| | : | DESIGNATION OF AGENT FOR |
| JAMES T. PATTEN, PETER L. COKER, SR., | : | SERVICE |
| AND PETER L. COKER, JR., | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action.  Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute Service upon the Commission for purposes of this action.

Date:   September 26, 2022

/s/ John V. Donnelly III
John V. Donnelly III
Gregory R. Bockin
Assunta Vivolo
Cecilia Connor

Attorneys for Plaintiff:
U.S. SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
215-597-3100 (phone)
215-597-2740 (fax)
DonnellyJ@sec.gov