UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>      v.<br><br>JAMES T. PATTEN, PETER L. COKER, SR.,<br>AND PETER L. COKER, JR.,<br><br>             Defendants. | Hon. Christine P. O'Hearn,<br>U.S.D.J.<br><br>Civ. No. 22-cv-05703 |

---

MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION OF THE UNITED STATES FOR LEAVE
TO INTERVENE AND FOR A STAY

---

PHILIP R. SELLINGER
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

SHAWN P. BARNES
Assistant United States Attorney

**PRELIMINARY STATEMENT**

The allegations in this civil enforcement action filed by the United States

Securities and Exchange Commission ("SEC") (the "SEC Case") against James T.

Patten ("Patten"), Peter Coker, Sr. ("Coker, Sr."), and Peter Coker, Jr. ("Coker,

Jr.") (collectively the "Defendants"), substantially overlap with an active criminal

case filed in this District against the Defendants that is captioned *United States*

*v. James Patten, Peter Coker, Sr., and Peter Coker, Jr.*, Crim. No. 22-643 (CPO)

(the "Criminal Case").

The United States of America, through the United States Attorney for the

District of New Jersey (the "United States"), moves to (1) intervene in the SEC

Case pursuant to Rule 24 of the Federal Rules of Civil Procedure; and (2) stay

further proceedings and discovery in the SEC Case in order to preserve the

integrity of the prosecution of the Criminal Case, advance the public interest,

and prevent the Defendants from circumventing the narrow confines of criminal

discovery through broad civil requests and related litigation.

**STATEMENT OF FACTS/PROCEDURAL HISTORY**

On September 26, 2022, the SEC filed a complaint (the "SEC Complaint")

alleging that the "Defendants . . . perpetrated two fraudulent schemes." (SEC

Complaint ¶ 4). According to the complaint in the SEC Case, the "Defendants

took control of the issued and outstanding shares of two companies: Makamer

Holdings, Inc. (f/k/a Hometown International, Inc.) ("Hometown International"),

an entity that had operations consisting only of a single deli in Southern New

Jersey, and EZRaider Co. (f/k/a E-Waste Corporation) ("E-Waste Corp."), a shell

2

company that had no substantive operations. [T]he Defendants artificially inflated the price of these companies' stock through manipulative trading that [the] Defendants executed through affiliated and nominee accounts they controlled, often using the same IP addresses to execute the trades. In so doing, [the] Defendants artificially raised the price and trading volume of the entities' common stock, creating the false appearance of active trading and a rising price for the security." *Id.* at ¶ 5.

The SEC Complaint described the impact that the Defendants' conduct had on Hometown International's stock valuation, stating: "[v]ia their scheme, [the] Defendants artificially inflated the price of common stock of Hometown International to more than $13.00 per share, which produced a market capitalization of approximately $100 million for a single-store deli with less than $40,000 in annual revenue." *Id.* at ¶ 6. The SEC Complaint also noted the impact that the Defendants' conduct had on E-Waste Corp.'s stock valuation, stating "[a]t the same time, [the] Defendants artificially inflated the price of E-Waste Corp. common stock from $0.10 to $10.00 per share, which resulted in a market capitalization of approximately $120 million for a shell company with no revenue." *Id.* at ¶ 7.

According to the SEC Complaint, from 2014 through the date of the complaint, the "Defendants have engaged in a long-running fraudulent scheme to take control of the outstanding shares of Hometown International; artificially inflate the value of those shares through matched and wash trades in which [the] Defendants, their nominees, and/or affiliates controlled both sides of the trade;

3

and eventually profit from their control of the company and inflated value of the shares of Hometown International stock. *Id.* at ¶ 35.

In describing the manner and means through which the Defendants sought to profit from the scheme, the SEC Complaint described how Patten convinced a childhood friend to incorporate a single-store deli. *Id.* at ¶ 36. The deli operated under the name "Your Hometown Deli" under the umbrella of the corporate entity that Patten had created – "Hometown International." *Id.* Once incorporated, Patten and Coker, Sr. arranged the sale of Hometown International's stock to several family members and associates. *Id.* at ¶ 37. Patten and Coker, Sr. then began the process of transitioning Hometown International into a publicly traded company. *Id.* at ¶ 39. Hometown International was first traded on a public market on October 20, 2019. *Id.* at ¶ 40.

On December 31, 2019, Patten facilitated the sale of two million shares of Hometown International, constituting approximately 38% of the outstanding stock, from the owners of Your Hometown Deli to Coker, Jr. for $3,000. *Id.* at ¶ 41. Approximately one month later, on or about February 1, 2020, Patten arranged for Coker, Jr. to obtain an option to purchase 1.5 million shares, which constituted approximately 28% of the outstanding shares of Hometown International stock. *Id.* at ¶ 42. On or about March 19, 2020, Coker, Jr. exercised the option and purchased the 1.5 million shares from one of Your Hometown Deli's owners. *Id.* at ¶ 44. In the interim, Coker, Jr. had been appointed Chairman of Hometown International's Board of Directors. *Id.* at ¶ 43. The day

after exercising the option, Coker, Jr. began transferring the 3.5 million shares of Hometown International to multiple nominee corporate entities located in Macau, China, which Coker, Jr. controlled (the "Macau Entities"). *Id.* at ¶¶ 46-48. Coker, Jr. "sold" the 3.5 million shares to the Macau Entities for $0.0015 per share, a price that was far-below the $4.00 market price. *Id.* at ¶¶ 47-49. Indeed, Coker, Jr.'s intentions were revealed in a March 20, 2020 email to Coker, Sr. in which Coker, Jr. stated that he was transferring the shares out of his name to disguise his control of a majority of Hometown International stock. *Id.* at ¶ 45.

On or about March 18, 2020, the Defendants caused the transfer of 100,000 shares of Hometown International stock to pay for a debt owed to Europa Capital, an entity that Coker, Sr., controlled, and another individual (referred to as Individual-1 in the SEC Complaint, and "Co-Conspirator-1" in the Indictment). *Id.* at ¶ 50. Approximately two months later, Europa Capital began "gifting" blocks of between 100 and 500 shares of Hometown International to 21 individuals, most of whom had relationships with Patten, Coker, Sr., and Individual-1. *Id.* at ¶ 51. This "gifting" of shares allowed the Defendants to meet the 50-shareholder requirement that was necessary to "uplist" Hometown International to a more desirable market. *Id.* at ¶¶ 52-53. On or about June 8, 2020, the Defendants caused a Form S-1 to be filed with the SEC, seeking to register 2.7 million shares of Hometown International stock, which were held by two of the Macau Entities (under Coker, Jr.'s control), Coker, Sr., Europa Capital (under Coker, Sr.'s control), and at least seventeen other individuals that were associated with the Defendants, so that the 2.7 million shares could be sold on

5

the open market. *Id.* at ¶ 54. Despite these ownership/control interests, the Form S-1 stated "[n]one of the Selling Shareholders nor any of their respective affiliates have held a position or office, or had any other material relationship, with us or any of our predecessors or affiliates." *Id.* at ¶¶ 55-56. On or about October 15, 2020, the registration took effect, and the 2.7 million shares could be sold on the open market. *Id.* at ¶ 57.

On or about April 14, 2020, the Defendants orchestrated a private placement of 2.5 million shares of Hometown International stock with three investors in Hong Kong in exchange for $2.5 million. *Id.* at ¶ 62. In the weeks following the $2.5 million cash infusion, the Defendants transferred large amounts of money to themselves and entities under their control, through direct transfers as well as "consulting agreements." *Id.* at ¶¶ 62-69. The Defendants reaped significant profits through these arrangements. *See id.* at ¶¶ 64-68.

At the same time, Patten took control of multiple brokerage accounts, many of which were in the Defendants' family members and associates' names, and used the accounts to engage in manipulative trading. *Id.* at ¶¶ 71-72. The Defendants also recruited others to assist in the manipulative trading. *See id.* at ¶¶ 79-82. The manipulative trades, frequently referred to as "matched trades" and "wash trades," *see id.* at ¶¶ 28-29, were intended to give the outward impression of genuine market interest in Hometown International's stock, when in reality, the stock never truly changed hands. *See id.* at ¶¶ 70, 73. The scheme achieved the ultimate objective of artificially inflating the valuation of Hometown International's stock – in October 2019, the stock was valued at approximately

$1.00 per share, and in April 2021, the stock was valued at approximately $14.00 per share. *Id.* at ¶ 70.

On or about April 15, 2021, negative news articles about Hometown International's artificially inflated stock valuation began to surface. *Id.* at ¶ 88. Despite accomplishing the initially intended reverse merger, *see id.* at ¶¶ 89-93, the Defendants' ultimate plan to reap a significant profit from the scheme was frustrated. *Id.* at 93.

The Defendants engaged in a remarkably similar scheme with respect to E-Waste Corp. *Id.* at ¶¶ 103-119. Indeed, as the SEC Complaint notes "[a]s Patten, Coker, Sr., and Coker, Jr., took control of the majority of E-Waste Corp.'s issued and outstanding stock through nominee entities, they employed tactics virtually identical to the Hometown International scheme, to profit from their control of the shell company." *Id.* at ¶ 103.

On September 22, 2022—four days before the SEC Complaint was filed—a grand jury in the District of New Jersey returned a twelve-count Indictment charging the Defendants with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (Count Two), conspiracy to manipulate securities prices, in violation of 18 U.S.C. § 371 (Count Three), and charging Patten with manipulation of securities prices, in violation of 15 U.S.C. §§ 78i(a)(2) and 78ff (Counts Four through Seven), wire fraud, in violation of 18 U.S.C. § 1343 (Counts Eight through Eleven), and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (the "Indictment").   (*See* Crim. No. 22-643 (CPO)

("Criminal Docket"), No. 1).  The charges in the Indictment arise from the same scheme set forth in the SEC Complaint, and both the Indictment and SEC Complaint contain similar allegations regarding the Defendants' actions in furtherance of the scheme to artificially inflate the price of Hometown International and E-Waste Corp. in order to generate an illicit profit.

On September 26, 2022, special agents of the Federal Bureau of Investigation arrested Patten and Coker, Sr. in connection with the Indictment. Later that afternoon, Patten and Coker, Sr. appeared before the Honorable L. Patrick Auld, United States Magistrate Judge for the Middle District of North Carolina, for an initial appearance during which the Court set conditions of release.  *See* 22-MJ-379 (Patten) and 22-MJ-380 (Coker, Sr.). On October 11, 2022, Patten and Coker, Sr., appeared before this Court for an initial appearance and arraignment, at which time both entered pleas of not guilty. *See* Criminal Docket No. 11. On the same date, the Court entered an initial scheduling order setting certain discovery deadlines.  (*Id.*, No. 13).  Trial in the Criminal Case has not yet been scheduled.  To date, Coker, Jr. remains a fugitive.

The Government has consulted with counsel for Patten and counsel for Coker, Sr. in the SEC Case.  Those defendants, through counsel, have advised that they consent to the Government's motion for a stay. The Government understands that a copy of the SEC Complaint has been served on Patten and Coker, Sr. Patten and Coker, Sr. have not yet answered the Complaint—indeed, their respective answers are due on December 15, 2022.  The SEC has advised that it does not oppose the Government's motion.

8

For the reasons set forth below, the Government respectfully requests that the Court permit the Government to intervene and stay the SEC Case pending disposition of the Criminal Case.

## ARGUMENT

### I.   THE UNITED STATES SHOULD BE PERMITTED TO INTERVENE IN THIS ACTION FOR THE LIMITED PURPOSE OF SEEKING A STAY

In its present application, the United States seeks to intervene for the limited purpose of staying this matter to protect the integrity of the ongoing prosecution of the Criminal Case. Under the Federal Rules of Civil Procedure, there are two bases for intervention: intervention as of right pursuant to Rule 24(a), or permissive intervention pursuant to Rule 24(b). The United States' intervention in the SEC Case is supported under both grounds.

### A.   The United States Is Entitled to Intervention as of Right

Federal Rule of Civil Procedure 24(a)(2) provides for intervention as of right as follows, in pertinent part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

"A potential intervenor must satisfy four criteria to succeed on a motion pursuant to Rule 24(a)(2): '(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the

interest is not adequately represented by an existing party in the litigation.'"
*United States v. Terr. of the V.I.*, 748 F.3d 514, 519 (3d Cir. 2014) (quoting *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987) (citation omitted)). "Although these requirements are intertwined, each must be met to intervene as of right."  *Harris*, 820 F.2d at 596 (citation omitted).

### 1. The United States' Motion for Intervention is Timely

The determination of whether a motion to intervene is timely is "determined from all the circumstances and, in the first instance, by the [trial] court in the exercise of its sound discretion." *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 223 F.R.D. 326, 328 (D.N.J. 2004) (citing *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) (quotations omitted)). Courts in the Third Circuit weigh three factors in determining timeliness: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995).

Here, the United States' motion to intervene is timely. The SEC Case was initiated on September 26, 2022 and no defendant has filed a responsive pleading—indeed, their responses are due on or about December 15, 2022. Furthermore, the Court has not yet set deadlines for additional proceedings and civil discovery has not yet commenced. Therefore, because the United States' motion to intervene will cause no delay or prejudice to the parties, it is timely. *See id.* at 370 (finding no prejudice from a four-year delay in filing intervention motion because, while some written discovery and settlement negotiations had

10

occurred prior to the motion, there were no depositions taken, dispositive motions filed, or decrees entered during the four-year period).

2. **The United States Has a Compelling Interest in the SEC Case That is Not Adequately Represented by the Existing Parties, and Which May Be Adversely Affected in the Absence of Intervention**

The United States has a substantial interest in the civil litigation that is not sufficiently represented by the existing parties and that may be harmed by the absence of the United States' intervention. Courts have recognized that "[t]he government ha[s] a discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the [parallel] criminal matter." *S.E.C. v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (per curiam); *see also S.E.C. v. Ott*, Civ. No. 06-4195 (GEB), 2006 U.S. Dist. LEXIS 86541, at *6 (D.N.J. Nov. 29, 2006) (Bongiovanni, U.S.M.J.) (finding that "it [wa]s clear that the United States ha[d] a direct and substantial interest in th[e] [SEC civil] litigation, because the ongoing parallel criminal investigation concern[ed] the same business practices, contracts and payments at issue in th[e] [civil] matter"); *S.E.C. v. Dubovoy, et al.*, Civ. No. 15-6076 (MCA) (D.N.J. Jan. 29, 2016) (Hammer, U.S.M.J.) (Dkt. No. 240) (granting United States' motion to intervene and stay SEC case based on same securities fraud scheme charged in criminal indictment, even though some of the defendants in the SEC case were not charged in the criminal indictment and opposed the stay request). This interest is present here, because if not stayed, the SEC Case presumably will proceed to the discovery stage and thus enable

the Defendants to extract material from the United States that they would not otherwise be entitled to at this stage in the Criminal Case.

Furthermore, intervention is necessary because only the United States Attorney can effectively represent these interests in the SEC Case. The SEC Case and the parallel Criminal Case involve the same three individual defendants, allegedly perpetrating the same fraudulent scheme, involving the same alleged victims, and carried out over a similar time-period. However, "the interests of the SEC in enforcing the provisions of the Securities and Exchange Act of 1934, and of Defendants do not represent those of the United States." *Ott*, 2006 U.S. Dist. LEXIS 86541, at *6 (citation omitted). The United States' interests concern safeguarding the criminal investigation and prosecution, matters separate and apart from the SEC's interests in protecting the integrity of financial markets. *See Nuesse v. Camp*, 385 F.2d 694, 702-04 (D.C. Cir. 1967). The interests of the litigants in the SEC Case may be adverse to those of the United States to the extent they seek to discover and publicize matters that are the subject of the ongoing criminal prosecution; intervention by the United States is necessary, therefore, in order to make sure its interests are adequately represented and protected.

Based on the foregoing, the United States should be granted leave to intervene as of right pursuant to Fed. R. Civ. P. 24(a).

**B.     Alternatively, the United States Should be Granted Permissive Intervention Because There are Common Questions of Law and Fact in the SEC Case and the Criminal Case**

Federal Rule of Civil Procedure 24(b)(1)(B) provides an alternative means for intervention—specifically, permissive intervention—where a party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "It is well-established that the United States Attorney may intervene in a federal civil action to seek a stay of discovery when there is a parallel criminal proceeding, which is anticipated or already underway, that involves common questions of law or fact." *S.E.C. v. Downe*, Civ. No. 92-4092 (PKL), 1993 WL 22126, *11 (S.D.N.Y. Jan. 26, 1993) (citing *Chestman*, 861 F.2d at 50); *Board of Governors of the Federal Reserve Sys. v. Pharaon*, 140 F.R.D. 634, 638 (S.D.N.Y. 1991); *First Merchants Enterprise, Inc. v. Shannon*, No. 88 Civ. 8254 (CSH), 1989 WL 25214 (S.D.N.Y. Mar. 16, 1989); *see also SEC v. One or More Unknown Purchasers of Sec. of Global Indus.*, Civ. No. 11-6500 (RA), 2012 WL 5505738, *2 (S.D.N.Y. Nov. 9, 2012). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Here, the SEC Case and the corresponding criminal prosecution of the same individual defendants arise out of numerous common questions of law and fact related to their alleged involvement in the above-described fraudulent scheme. Moreover, intervention will not cause undue delay or prejudice the parties, particularly since the civil discovery process has not commenced. Accordingly, even if the Court were to find that the United States may not

13

intervene as of right, the Court should exercise its discretion to allow the United States to intervene in this case for the limited purpose of moving for a stay.

## II.   A STAY OF THE SEC CASE IS NECESSARY TO PROTECT THE INTEGRITY OF THE ONGOING CRIMINAL PROSECUTION

### A.   The Court Has the Authority to Issue a Stay

The United States seeks to intervene for the limited, and authorized, purpose of staying this matter. Courts have the inherent authority to stay proceedings in a civil case in the interests of justice when a parallel criminal prosecution is underway. *See RAD Services, Inc. v. Aetna Casualty & Surety Co.*, 808 F.2d 271, 279 n.3 (3d Cir. 1986); *SEC v. HealthSouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D. Ala. 2003). It is "clearly within the power of the district court to balance 'competing interests' and decide that judicial economy would best be served by a stay of civil proceedings." *United States v. Mellon Bank, N. A.*, 545 F.2d 869, 872-873 (3d Cir. 1976) (quoting *Texaco, Inc. v. Borda*, 383 F.2d 607, 609 (3d Cir. 1967)).

Factors that courts have considered in weighing whether a stay is warranted include: the extent to which the criminal and civil cases overlap; the interests of the public in the pending civil and criminal litigation; the potential prejudice to the civil parties of delaying their litigation; the interests of the court; and the status of the criminal case. *See Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324–25 (9th Cir. 1995); *Walsh Sec. v. Cristo Prop. Mgmt.*, 7 F. Supp. 2d 523, 526-27 (D.N.J. 1998); *HealthSouth*, 261 F. Supp. 2d at 1326. These factors support a stay in this case.

**B.    The Criminal and Civil Matters Overlap**

There is substantial overlap between the Criminal Case and the SEC Case. As noted, they involve the same individual defendants and the same securities fraud scheme. As a result, many of the potential witnesses in the Criminal Case also are potential witnesses in the SEC Case.

**C.    The Public Interest Favors a Stay**

It is well settled that "a trial judge should give substantial weight to [the public interest in law enforcement] in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities." *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962). As one court has observed, "where both civil and criminal proceedings arise out of the same or related transactions, the government is ordinarily entitled to a stay of all discovery in the civil action until disposition of the criminal matter." *United States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966); *see also S.E.C. v. Shkreli*, 15-CV-7175, 2016 WL 1122029, *7 (E.D.N.Y. March 22, 2016) (granting government's motion to stay SEC case over the defendant's objection and noting, "the public's interest in the effective enforcement of the criminal law is the paramount public concern."); *S.E.C. v. Nicholas*, 569 F. Supp. 2d 1065, 1072 (C.D. Cal 2008) ("The criminal case is of primary importance to the public, the Defendants, and the Court"; the public's interest "is best served by resolving the criminal case in the most expeditious manner possible.").

A stay of discovery in this matter also is in the public's interest because it will prevent the defendants from utilizing the expansive civil discovery rules to

15

obtain discovery that they otherwise would not be entitled to under the narrow rules of criminal discovery. As the Third Circuit explained in *Mellon Bank*, a civil litigant should not be permitted to proceed simultaneously with an overlapping criminal matter, because "the similarity of the issues [leaves] open the possibility that [the defendant] might improperly exploit civil discovery for the advancement of his criminal case." 545 F.2d at 873. The possibility of improper use of discovery, in part, led the court in *Mellon Bank* to stay discovery. *Id.* at 874. The concern expressed in *Mellon Bank* that criminal discovery limitations not be circumvented has been echoed by many courts that have stayed civil discovery in parallel proceedings.

For example, in *Campbell*, the Fifth Circuit stated:

> A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal suit. Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other.  In some situations it may be appropriate to stay the civil proceeding.  In others it may be preferable for the civil suit to proceed – unstayed.  In the proper case the trial judge should use his discretion to narrow the range of discovery.

307 F.2d at 487 (internal citation omitted).

Courts around the country, including in this District, have relied on similar logic to stay civil discovery while criminal proceedings are ongoing.  *See Ott*, 2006 U.S. Dist. LEXIS 86541, at *3-10; *Dubovoy,* Civ. No. 15-6076 (D.N.J.) (Dkt. No. 240); *United States v. GAF Financial Services*, 335 F. Supp. 2d 1371, 1373 (S.D. Fla. 2004) (civil forfeiture stayed pursuant to 18 U.S.C. § 981(g));

*Downe*, 1993 WL 22126, at \*12–14; *In re Ivan F. Boesky Securities Litigation*, 128 F.R.D. 47, 49-50 (S.D.N.Y. 1989); *United States v. Hugo Key & Son, Inc.*, 672 F. Supp. 656, 657-59 (D.R.I. 1987); *Founding Church of Scientology v. Kelley*, 77 F.R.D. 378, 380-81 (D.D.C. 1977); *SEC v. Control Metals Corp.*, 57 F.R.D. 56, 57-58 (S.D.N.Y. 1972).

Notwithstanding the concern that litigants will exploit the liberal civil discovery rules to their advantage, the United States does not have to demonstrate that any particular defendant already has unfairly taken advantage of the civil discovery provisions to the detriment of the United States or the public. Rather, it is presumed that criminal defendants and targets will make full use of such an unsurpassed opportunity to harm the Government's criminal cases. *See Integrated Generics, Inc. v. Bowen*, 678 F. Supp. 1004, 1009 (E.D.N.Y. 1988) (no need to find wrongful intent). Courts have recognized the unfair advantages inherent in civil discovery opportunities and have, accordingly, stayed discovery. *See, e.g., Control Metals Corp.*, 57 F.R.D. at 57 (staying depositions of four grand jury witnesses).

In the present case, given the overlap of witnesses and issues between the SEC Case and the Criminal Case, interrogatories and deposition notices in the SEC Case could undermine or otherwise hinder the criminal prosecution. *Campbell*, 307 F.2d at 487 n.12. Even if the defendants here "possessed the purest of motives," allowing civil discovery to go forward would make them "the beneficiar[ies] of materials otherwise unavailable to [the]m under the criminal

rules . . . thus nullifying in effect the criminal discovery limitations." *In re Eisenberg*, 654 F.2d 1107, 1113-14 (5th Cir. 1981).

### D.   The Public's Interest in Allowing the Criminal Case to Be Completed Without Interference Outweighs the Minimal Prejudice to the Defendants From a Stay

The public's significant interest in allowing the Criminal Case to run its course must be balanced against a civil litigant's interest in a final resolution of its case.  All litigants, of course, have an interest in the swift resolution of their claims and defenses. The United States is mindful that neither the Court, the SEC, nor the Defendants want this case to be delayed unnecessarily.

Nonetheless, disposing of the SEC Case expeditiously does not outweigh the importance of conducting an unimpeded criminal prosecution. This is especially true where a stay until the completion of any trial in the Criminal Case will cause little to no particularized harm to the public, the SEC, or to the Defendants, and even could benefit the Defendants in light of the potential Fifth Amendment implications involved in proceeding with the SEC Case. *See Ironbridge Corp. v. C.I.R.*, 528 F. App'x 43, 46 (2d Cir. 2013) ("We also presume that parallel civil and criminal proceedings can sometimes burden the exercise of the Fifth Amendment privilege against self-incrimination."); *S.E.C. v. McGinnis*, No. 14-CV-6, 2016 WL 591764, *3 (D. Vt. Feb. 12, 2016) ("Defendants additionally point out that proceeding in the instant case may compromise their Fifth Amendment rights to the extent not already waived ...."); *S.E.C. v. Oakford Corp.*, 181 F.R.D. 269, 270 (S.D.N.Y. 1998) ("Often the [stay application filed by the criminal enforcement agency] is joined by the defendant as well, who

18

otherwise confronts the prospect of expensive dual litigation and the dilemma either of having to testify in a pre-trial deposition or, by invoking the privilege against self-incrimination, subjecting himself to a permissible adverse inference in the civil case.") (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

###### E.      A Stay Would Likely Narrow the Issues in the SEC Case

Finally, a stay also would benefit the public interest by potentially narrowing (or eliminating) the issues to be decided in the SEC Case. *See In re Grand Jury Proceedings (Williams)*, 995 F.2d 1013, 1018 n.11 (11th Cir. 1993) ("Although stays delay civil proceedings, they may prove useful as the criminal process may determine and narrow the remaining civil issues."); *Texaco Inc.*, 383 F.2d at 609 (affirming decision to stay civil action because, among other things, "the trial of the criminal case [might] reduce the scope of discovery in the civil action . . . [a]nd . . . perhaps might also simplify the issues"); *Brock v. Tolkow*, 109 F.R.D. 116, 120 (E.D.N.Y. 1985) ("[T]he resolution of the criminal case might reduce the scope of discovery in the civil case or otherwise simplify the issues.").

For example, if the Criminal Case results in guilty verdicts against a defendant or defendants, the higher burden of proof in the criminal matter likely will mean that the jury's findings will have preclusive effect in the SEC Case. Likewise, if the Criminal Case results in a guilty plea by either defendant, that defendant's admissions will undoubtedly narrow, and perhaps eliminate, the issues to be decided against that defendant in the SEC Case. In either case, there would likely be little left to litigate civilly after a successful criminal prosecution.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the United States respectfully requests that the Court grant it leave to intervene in the SEC Case and order a stay of the SEC Case until the conclusion of the Criminal Case.

Respectfully submitted,
PHILIP R. SELLINGER
United States Attorney

By: _____

SHAWN P. BARNES
Assistant United States Attorney

Dated: Newark, New Jersey
        December 7, 2022